IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL ROMANO | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PHILADELPHIA SCHOOL DISTRICT AND | : | |
| MICHELLE BURNS | : | NO.  07-3969 |

## MEMORANDUM

**Padova, J.**                                                                                          **May 26, 2009**

Defendants the Philadelphia School District (the "School District") and Michelle Burns, the Principal of Tilden Middle School ("Tilden"), have filed a Motion for Summary Judgment in this action in which Plaintiff asserts a § 1983 retaliation claim, and a claim under the Pennsylvania Whistleblower Law, 43 Pa. Cons. Stat. §§ 1421-1428, based on discipline he suffered as a school nurse at Tilden after he voiced concern that Tilden was not complying with its statutory duties to report in-school acts of violence.  For the following reasons, we deny the Motion.

I.      BACKGROUND

In October of 2000, the School District hired Plaintiff as a school nurse and assigned him to be the primary nurse at Tilden.  (Pl. Dep. at 183:9-13; 183:19-184:2.)  One of Plaintiff's responsibilities as a nurse was to complete various medical screenings of students, including growth, vision and hearing screenings, and screenings for scoliosis.  (Pl. Dep. at 88:24-89:16.)  The undisputed record evidence shows that Plaintiff did not complete all of the required medical screenings for either the 2003-2004 school year or the 2004-2005 school year.  (Pl. Dep. at 137:22-138:6.)

At the beginning of the 2005-2006 school year, Defendant Michelle Burns took over as principal of Tilden.  (Burns Dep. at 8:7-17.)  During that year, Plaintiff worked full-time at Tilden,

and he was assisted by three part-time nursing assistants.  (Jackson Dep. at 24:8-26:17; Pl. Dep. at 235:21 - 236:2.)  Plaintiff's only screening responsibility was to screen 5th grade students.  (Pl. Dep. at 236:12-24.)  Nevertheless, he did not complete those 5th grade screenings.  (Id. at 237:11-12.)

In the course of the 2005-2006 school year, Plaintiff had a series of performance-related issues.  Principal Burns criticized Plaintiff during the school year for not respecting the School District's internet policy and held a conference with Plaintiff to discuss this issue.  (Id. at 273:16-274:2.)  Also, on December 7, 2005, Burns sent a Memorandum to Plaintiff, advising him that a conference had been scheduled to "discuss some concerns with regards to [his] disregard to follow established procedures and some other concerns regarding [his] professionalism with regards to the health room."  (Ex. D-12.)   At the conference, which was held on January 11, 2006, Burns specifically addressed Plaintiff's (1) refusal to follow the Assistant Principal's directive to treat a student who had been in a fight on December 2, 2005, and who had "numerous marks and blood over her face;" and (2) disregard of the "established chain of command with regards to reporting incidents that take place at Tilden . . . ."  (Ex. D-13; Pl. Dep. at 266:11-267:9.)  Following the conference, which Plaintiff attended with his union representative, Plaintiff consulted with legal counsel because he considered the assertion that he had refused to follow a directive to be "a grave allegation."  (Id. at 265:12-18; 268:7-269:10.)

 Also during the 2005-2006 school year, Assistant Principal Lola Marie Davis-O'Rourke, who was Plaintiff's direct supervisor, Principal Burns, and Student Health Coordinator Sandra Jackson met with the three Tilden nursing assistants and Plaintiff,[1] at a nursing assistant's request.

---

[1]Ms. Jackson was the coordinator for the Southwest and West Philadelphia regions of the School District, and was responsible for overseeing the duties of approximately 60 school nurses, including Plaintiff.  (Jackson Dep. at 9:19-10:14; 11:1-3.)

(Jackson Dep. at 37:5-38:4; 40:8-13.)  At that meeting, the nursing assistants expressed concern that they were being required to do a lot of work that Plaintiff should have been doing -- namely, treating sick students and reviewing records of transfer students -- and that, as a result, they were unable to complete their own screening responsibilities.  (Id. at 41:3-43:1.)  At the end of the school year, over one hundred hearing screenings remained uncompleted, and Jackson therefore directed Plaintiff to finish those screenings in September of the following school year.[2]  (Pl. Dep. at 237:14-18; 239:5-14; 306:4-16; Jackson Dep. at 85:4-12.)  At the same time, in spite of Plaintiff's various performance issues, Principal Burns gave Plaintiff a year-end "Satisfactory" rating.  (Pl. Ex. 34.)

In the 2006-2007 school year, Tilden was reorganized so that its enrollment decreased from 1200 students to 578 students.  (Burns Dep. at 17:8-21.)  Plaintiff was the only nursing professional assigned to the school for that academic year, i.e., in contrast to the prior year, no part-time nursing

---

[2] Principal Burns testified that, in addition to the above performance issues,  she sent Plaintiff a conference memorandum towards the end of the 2005-2006 school year, and had a meeting with Plaintiff and his union representative, about his failure to complete his screenings for the school year. (See Burns Dep. at 170:22-171:5; 175:9-23).  According to Principal Burns, she told Plaintiff at that meeting what would be expected of him in the 2006-2007 school year with respect to screenings. (Id. at 175:9-23.)  The conference memorandum is not in the record in this case.  Principal Burns testified that the memorandum was removed from Plaintiff's file at the end of the school year at his request.  (Id. at 169:9-16.)  Plaintiff, however, denies both that any such conference memorandum ever existed and that he had any such meeting with Burns at the end of the school year.  (Pl. Aff. ¶ 9.)

Defendants urge us to disregard Plaintiff's denial of these facts, noting that the denial is in an affidavit that was filed at the "eleventh-hour" and contradicts his deposition testimony. However, we do not read Plaintiff's deposition to contradict the material statements in the affidavit.  Moreover, in support of Defendants' assertion that we should disregard Plaintiff's affidavit, Defendants cite only an unpublished 1994 Eastern District of Pennsylvania opinion, and a 1969 Second Circuit decision, neither of which are binding on us.  See Defs.' Reply Br. at 10-11 (citing Gehring v. Showa Denko, K.K., Civ. A. No. 91-6855, 1994 WL 597584, *2-3 (E.D. Pa. Nov. 2, 1994), and Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)).  Accordingly, we find that there is a genuine factual issue as to whether Principal Burns issued a conference memorandum and met with Plaintiff in the 2005-2006 school year concerning his failure to complete his screenings.

assistants were assigned to assist him.  (See Pl. Dep. at 247:18-23.)  During the first half of the 2006-

2007 school year, Plaintiff was again notified of certain concerns regarding his performance at

Tilden.  On October 30, 2006, Burns sent Plaintiff a "Conference Notice," scheduling a meeting "to

discuss [Plaintiff's] failure to notify administration . . . [that he] would not be returning to work from

[his] lunch on Monday, October 23, 2006."  (Ex. D-16.)  Five weeks later, on December 6, 2006,

Burns sent Plaintiff another memo, advising him that, as of the date of the memo, Plaintiff had

"failed to comply with the state mandates regarding immunizations of students who are out of

compliance," and directing him to "have the first immunization notification letters completed for all

students who are out of compliance" by December 8, 2006.  (Ex. D-17.)

　　　　On March 22, 2007, Plaintiff sent an email to Principal Burns, stating, in relevant part, as

follows:

> In view of the recent media spotlight on violence in schools, I am
> concerned (as I am sure that you are) that all staff at Tilden be
> knowledgeable concerning record keeping, disclosure, and protocols
> relating to acts of violence at our school.
>
> Although I have been here seven years, I have not been provided with
> any law enforcement protocols or memorandum of understanding
> which sets forth procedures to be followed when an incident
> involving an act of violence or possession of a weapon by any person
> occurs on Tilden school property.  Do we have any such protocols or
> memorandum of understanding?  I think we should.  Please provide
> them to me and other staff promptly, so that we can be sure to
> properly handle these situations according to protocols relating to acts
> of violence at our school.
>
> Also, do we keep records or surveys of the number of incidents
> involving acts of violence at Tilden? . . . . If we do keep any such
> records, I assume they are public information and I would like to
> review these records for the past five years.
>
> Similarly, do we keep records or surveys of all cases involving

possession of a weapon by any person on Tilden property?  I would like to review these records for the past five years.

From a healthcare standpoint, I also have concerns about the number of drug and alcohol possession and usage cases at the school.  Do we keep records of such incidents?  If so, I would like to review these records for the past five years.

\*     \*     \*

Please provide me a written response within one week if possible. Thank you.

(Pl. Ex. 7.)   Burns replied that the information Plaintiff sought was available either in the Student Code of Conduct or on the School District website.  (See Pl. Ex. 8 at 1.)  On March 28, 2007, Plaintiff sent an email to James Golden, the Chief Safety Executive for the School District, advising Golden of the correspondence with Burns and explaining that he had not been able to find the requested information in the locations that Burns had identified.  (Id.; Golden Dep. at 7:19-23.) Given his inability to find the information, Plaintiff asked Golden whether Tilden was, in fact, in compliance with 24 Pa. Cons. Stat. § 13-1303-A, which requires the public to have access to information regarding acts of violence at a school.  (Pl. Ex. 8 at 1-2.)  Plaintiff requested that Golden advise him within one week as to "how the public can have easy access to" certain specified information regarding violence incidents at Tilden and the reporting of such incidents.  (Pl. Ex. 8 at 2-3.)

On March 30, 2007, Plaintiff sent an email to Lola Marie Davis-O'Rourke, whom he had also copied on his email to Golden.  (See id. at 1.)  In that email, he noted both that he had not yet received the information that he had requested in his March 22 and March 28 emails, and that he and his attorney had been unable to locate the information on the School District web site.  (Id. at 4.)  He

therefore asked her to "[k]indly indicate **exactly where on the Phila. School District web site the requested information** . . . is located.  (Id. at 4 (emphasis in original).)  According to Davis-O'Rourke, she received this email twice and, after the second email, she responded that Plaintiff could find the information he sought on the School District Web site page and further explained "how to navigate through" the Web site page.  (Davis-O'Rourke Dep. at 115:3-17.)

On April 10, 2007, Plaintiff met with Jackson and Davis-O'Rourke "due to his numerous e-mails requesting . . . assistance in completing his screenings,"[3] and Jackson's determination that he had, in fact, not finished or completed a great number of screenings.  (Davis-O'Rourke Dep. at 88:1-4; Jackson Dep. at 103:12-104:9; 107:9-13.)  At the meeting, Jackson raised a number of issues regarding Plaintiff's conduct.  (Davis-O'Rourke Dep. at 90:5-9.)  First, she alerted him that he should stop using personal "codes" in his nursing notes because other people needed to be able to read the notes to see what treatments he was giving to students.  (Id. at 90:11-91:4.)  Second, Jackson discussed with him an incident involving an incomplete Section 504 form for a student.[4]  (Id. at 93:6-17.)  Third, she raised his request for more assistance with screenings.  (Id. at 93:20-94:2.)  Together, they came up with an "action plan" to assist Plaintiff in making some headway on his screenings, which called for the health office to be closed to students on Wednesday, Thursday and Friday of that week, so that Plaintiff could spend (a) Wednesday completing 13 hearing screenings that were left over from the prior school year, (b) Thursday finishing up notes that he needed to put into the

---

[3]Plaintiff explains in his brief that he "had difficulty completing screening[s] because of the volume of students that came into his office throughout the day with health problems [and because of] other nursing duties he performed."  Pl. Br. in Opp. to Sum. Judg. at 10.

[4]A "504 form" is a form concerning students who have disabilities or handicaps.  (Id. at 93:10-14.)

computer, and (c) Friday doing 8th grade vision screenings.  (Davis-O'Rourke Dep. at 100:13-101:13.)  At the conclusion of the meeting, Davis-O'Rourke told Plaintiff that if the screenings were not done in an orderly fashion, she would need to advise Burns.[5]  (Id. at 168:21-169:5.)  At that point, Plaintiff "decided to leave the meeting stating that he wanted his PFT building rep there." (Id. at 169:6-9.)  However, he was unable to locate his union representative and went back to his office. (Id. at 169:10-17.)

   That same day, Davis-O'Rourke spoke with Burns, telling her about the action plan that she, Plaintiff and Jackson had devised.  (Id. at 169:21-170:10.)  Burns indicated that she found the plan acceptable and made an announcement over the school loudspeaker to the teachers, letting them know that the nurse's office would be closed for the three designated days and that all medical problems that developed on those days would be seen by administration.  (Id. at 170:11-19.)  The following day, April 11, Davis-O'Rourke met with Plaintiff, who told her that he needed more time "because he had a large stack of student health documentation that needed to be put into the computer because he was behind putting it in."  (Id. at 176:21-177:4.)  Davis-O'Rourke therefore agreed to extend the closing of the health office one more day -- until Monday, April 16 -- to permit him time to put his documentation into the computer.  (Id. at 178:2-5.)

   On April 18, 2007, at Plaintiff's request, Plaintiff met with Jack Stollsteimer, the Safe Schools Advocate for the Commonwealth of Pennsylvania, for the purpose of discussing Tilden's alleged under-reporting of violence.  (Pl. Aff.  ¶¶ 5, 8; Stollsteimer Dep. at 12: 9-16.)  Immediately

---

[5]According to Davis-O'Rourke, she also told Plaintiff that if the screenings were not taken care of immediately, he could be disciplined.  (Id. at 168:12-169:5.)  However, according to Plaintiff: "At no time at this meeting was discipline ever discussed."  (Pl. Aff. ¶ 10.)  This is therefore a disputed fact.

after the meeting with Romano, Stollsteimer "went next door to meet with Principal Burns" to see

if there was a way we could get Plaintiff and Burns "to talk together to find out whether or not . . .

there was any truthful basis to [his allegations]." (Stollsteimer Dep. at 137:24-138:6.) Burns told

him that she could not meet with Romano, because they were involved in an employment dispute,

but that she would be "happy to sit down with" Stollsteimer at another time. (Id. at 138:6-14.)

Burns subsequently called her union to inform them what was going on. (Burns Dep. at 220:5-

222:21.) Burns met again with Stollsteimer on April 27, 2007, and, ultimately, Stollsteimer found

Plaintiff's allegations of underreporting to be unfounded. (Stollsteimer Dep. at 141:4-14; Pl. Dep.

at 372:5-15.)

    In the meantime, on April 19, 2007, Principal Burns sent Plaintiff an "Unsatisfactory Incident

Conference Notice,"[6] scheduling a conference to discuss the following:

> 1. Refusal to follow given directive given to you on April 10, 2007,
> to start mandated vision screenings on Monday April 16, 2007.
> 2. Hearing Test from School Year 05-06 of students who were not
> completed. You were directed in May 2006 to complete all 05-06
> hearing screenings in September 2006.
> 3. Lack of Parental outreach, since September 2006, regarding 6th
> grade physicals.
> 4. Out of 179 7th grade students, 156 Growth/Height Screenings
> remain outstanding/not completed.
> 5. Out of 157 6th graders, 127 physicals remain outstanding/not
> completed.
> 6. Out of 157 6th graders, 131 Hearing Test [sic] from 06-07 school
> years remain outstanding/not completed.
> 7. Out of 578 students, 463 Vision Screenings are outstanding/not
> completed.

---

[6]Defendants assert that Burns began preparing the Notice before Plaintiff met with
Stollsteimer on April 18. However, at her deposition, Burns could not recall exactly when she began
preparing the Notice and testified only that it was sometime after April 10, 2007, noting that the
factual information in the Notice was given to her after the April 10 meeting. (Burns Dep. at 333:5-
20.)

8.   Out of 157 6th graders, 142 Scoliosis Screenings are outstanding/not completed.
9.   Out of 179 7th graders, 162 Scoliosis screenings are outstanding/not complete.
10.  Inclusion of phone calls and meetings documentations as part of your health room log.
11.  Refusal to follow directive to stop using codes medical and personal when entering nurse notes on SCN.
12.  Falsification of documentation regarding student injuries you entered in the Health Room Log on SCN.
13.  Failure to properly secure confidential student information, by placing them in public areas in the main office.
14.  Failure to submit to Administration, M98 form to use in your absence.

(Ex. D-21.)

That same day, Burns also sent a copy of the Unsatisfactory Incident Conference Notice to Nancy Erskine, the Director of School Health Services, with a copy to School District Labor Relations Assistant Ted Bywalski.  (See Pl. Ex. 6.)   In that same email, she informed Erskine and Bywalski that Plaintiff had contacted Stollsteimer and alleged that the school was underreporting serious incidents of violence, but that her investigation had revealed that all verified incidents had been reported and that Plaintiff had falsified documentation of other incidents.  (Id.)  Bywalski responded to the email with a warning that  Principal Burns "need[ed] to be careful not to make this look like retaliation."  (Id.)  As he explained, this meant that she had "to take out all the issues like item 3 that [she had] not dealt with since [September 2006] but have been ongoing since September [2006]" and item 2, screenings not done in 2005-2006.  (Id.)  He further warned that she needed to be more specific about items 10, 11, 13 and 14, and needed to "be sure that [she had] copies of related documents."  (Id.)  Finally, he noted that item 12 was "extremely serious," and cautioned that she would need to have this "very carefully documented."  (Id.)

On May 16, 2007, Burns conducted an investigatory conference with Plaintiff and his union representative to address the April 19, 2007 Unsatisfactory Incident Conference Notice. (Ex. D-22, at 2.) At the conclusion of the conference, Burns issued an Unsatisfactory Incident Report in which she concluded that, with twenty days remaining in the school year, Plaintiff had yet to complete 110 of 157 hearing screenings, 156 of 179 growth screenings, 124 of 157 physicals, 365 of 578 vision screenings, and 107 of 336 scoliosis screenings.[7] (Id. at 5-10.)  As a result, she recommended that Plaintiff be suspended without pay for five days, that he be administratively transferred with prejudice, that he receive an unsatisfactory rating for the school year, and that he be retrained in his job duties and responsibilities.[8]  (Id. at 11.)  Plaintiff appealed the conference findings and Burns held a "Level One Conference" with Plaintiff and his union representative on May 30, 2007, to consider their additional arguments.  (Ex. D-23.)  Following that appeal, however, Burns's recommendations remained the same.  (Id.)

Plaintiff appealed the Level One decision, and on June 19, 2007, a Level Two Conference was held.  (Pl. Ex. 27 at 1.)  The Level Two Conference was attended by Plaintiff, his union representative, Nancy Erskine, and Ted Bywalski.  (Id.)  Following the Level Two Conference,

---

[7]According to Burns, another 197 of the 336 scoliosis screenings had been done incorrectly. (Id. at 7.)

[8]In defending Burns's decision in this regard, Defendants argue that Jackson "adamantly urged" Burns to write Plaintiff up in May 2006 and give him an unsatisfactory rating for the 2005-2006 school year, and that it was at Jackson's "strong insistence" that Burns prepared the unsatisfactory incident report in April of 2007.  (Defs.' Statement of Material Facts ¶¶ A23, A27, C5.)  However, Jackson's deposition testimony does not clearly support this characterization of her actions.  While Jackson testified that towards the end of the 2005-2006 school year and again in the Spring of 2007, she told Burns that Plaintiff's deficiencies should be documented in writing, she at no time testified that she "urged" Burns to discipline Plaintiff.  (Jackson Dep. at 83:20-84:10; 111:24-113:4.)

Erskine issued written findings in which she stated, inter alia, that it was "evident" from the specific data presented in connection with the Unsatisfactory Incident Report that "the majority of mandated health screenings at Tilden . . . were seriously out of compliance." (Id. at 3.)  Erskine also agreed with Principal Burns's recommendation for a five-day suspension, administrative transfer, unsatisfactory rating, and retraining. (Id. at 3-4.)  Plaintiff again appealed, this time to the School Reform Commission.  Then-chairman James E.  Nevels and Interim CEO Thomas M. Brady reviewed the record and found, on August 24, 2007, that there was "just cause" for the recommended disciplinary actions. (Id.)  Consequently, the School District imposed the recommended discipline. (Pl. Aff. ¶ 11.)

In August 2007, Plaintiff was assigned to be a full time nurse at James J. Sullivan Elementary School pursuant to the disciplinary transfer. (See Bainbridge Dep. at 28:17-29:11; Pl. Aff. ¶¶ 2, 11.)  For the 2007-2008 school year, the School District implemented goals that 25% of screenings be completed by November 2007, 50% be completed by January 2008, 75% be completed by March 2008, and 100% be completed by May 2008. (Ex. D-29.)  Soon after Plaintiff's arrival at Sullivan, Plaintiff "came under the same criticism of not adequately performing state mandated screenings." (Pl. Aff. ¶ 13.)  On November 26, 2007, Sullivan's principal, Dr. Patricia Bainbridge, who had not been told of Plaintiff's past performance problems and discipline, asked Plaintiff for documentation of the screenings that he had completed through November by December 3, 2007. (Ex. D-30.)  On January 11, 2008, having concluded that Plaintiff had completed just 10.65% of the required medical screenings by that date, Bainbridge scheduled an Investigatory Conference for January 14, 2008. (Ex. D-35.)  Thereafter, Bainbridge prepared a draft Unsatisfactory Incident Report, recommending that Plaintiff be suspended for 3-5 days on account of his screening deficiencies. (Bainbridge Dep.

-11-

at 31:2-5; 32:22-33:6; Pl. Aff. ¶ 13.)  When Bainbridge sent the draft report to Gail Kaprow, the School District's East Region Labor Relations Assistant, Kaprow told her that, consistent with School District disciplinary policy, the recommended discipline had to be changed to termination because Plaintiff had received another Unsatisfactory Incident Report for the same problem in the preceding 18 months.  (Bainbridge Dep. at 31:2-32:4; 34:18-35:3.)  Accordingly, Bainbridge changed her recommendation as directed.  (See Ex. D-36.)

Plaintiff appealed that decision and a Level Two Conference was held on February 12, 2008. (Pl. Ex. 31 at 1.)  In attendance at that conference were Plaintiff, his union representative, Kaprow, and Wilfredo Ortiz, the Regional Superintendent.  (Id.)  Plaintiff asserted at that conference that by February 14, 2008, he had increased his percentage of completed screenings to 27% and that by March 6, 2008, he had completed 35%.  (Id. at 2.)  He maintained that he could complete all of his required screenings in the remaining 69 school days in the academic year by screening 7 students a day.  (Id.)  Upon consideration of all of the oral and written submissions, on March 12, 2008, Ortiz recommended that Plaintiff be suspended without pay for ten days.  (Id. at 1.)  She also stated in the recommendation that "it is expected that [Plaintiff] complete the screening and meet the benchmark target percentage in a timely manner; failure to comply with the mandates, may result in an unsatisfactory rating and/or termination."[9]  (Id.)

In the meantime, on September 21, 2007, Plaintiff commenced this action against Defendants.  In the first Count of his Complaint, which asserts a claim under 42 U.S.C. § 1983, he

---

[9]Neither party explains why the recommendation was revised downward, and the summary judgment record does not disclose what occurred subsequent to the revised recommendation. Plaintiff asserts in his brief that the School District continues to seek his termination, but he cites no record evidence that supports this assertion.

alleges that Defendants violated his First Amendment rights by retaliating against him for speaking out on a matter of public concern.[10]   In the second Count, he alleges that the same retaliatory conduct violated the Pennsylvania Whistleblower Law.   After extensive discovery, Defendants filed the instant Motion for Summary Judgment, seeking judgment in their favor on both Counts of the Complaint.   We held oral argument on the Motion on January 5, 2009.

II.    LEGAL STANDARD

Summary judgment should only be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In making this determination, we "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 276 (3d Cir. 2001)  (internal quotation marks omitted).  If a reasonable fact finder could find in the nonmovant's favor, summary judgment may not be granted.  Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 130 (3d Cir. 2002).

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  After the moving party has met its initial burden, the "opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must - by affidavits or as

---

[10]At oral argument, Plaintiff clarified that he is alleging that Defendants retaliated against him by (1) issuing the April 19, 2007 Unsatisfactory Incident Conference Notice, (2) imposing a five-day suspension, transferring him to the Sullivan School, and giving him an unsatisfactory rating for the 2006-2007 school year, and (3) recommending that he be terminated from employment, allegedly based on his deficient conduct at the Sullivan School.

otherwise provided in [Rule 56] – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). "'While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.'" Galli v. N.J. Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Hugh v. Butler County Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005)). "Evidence that is merely colorable or not significantly probative is insufficient to create a genuine issue of material fact for trial." West v. Lincoln Benefit Life Co., 509 F.3d 160, 172 (3d Cir. 2007) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and El v. Southeastern Pa. Transp. Auth., 479 F.3d 232, 238 (3d Cir. 2007)). "Where the First Amendment is involved, we 'undertake exacting review of the whole record with a particularly close focus on facts that are determinative of a constitutional right.'" Galli, 490 F.3d at 270 (quoting Armour v. County of Beaver, Pa., 271 F.3d 417, 420 (3d Cir. 2001)).

III.    DISCUSSION

       Defendants argue that we should enter judgment in their favor on both Counts of the Complaint because there are no genuine issues of material fact and no reasonable jury could find based on the undisputed record evidence that Defendants violated either § 1983 or the Whistleblower Law.

       A.    42 U.S.C. § 1983

       Section 1983 provides a remedy against "any person" who, under the color of law, deprives another of his constitutional rights. 42 U.S.C. § 1983. There is a three-step, burden-shifting analysis for retaliation claims made pursuant to the First Amendment under § 1983. Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005); Watters v. City of Philadelphia, 55 F.3d 886, 892 (3d Cir. 1995).

-14-

First, the plaintiff must show that he engaged in conduct or speech that is protected by the First Amendment. Hill, 411 F.3d at 125 (citing Pickering v. Bd. of Educ., 391 U.S. 563 (1968); Watters, 55 F.3d at 892 (citations omitted). Second, the plaintiff must show that the protected activity was a substantial or motivating factor in the alleged retaliatory action.[11] Watters, 55 F.3d at 892 (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)); Hill, 411 F.3d at 125 (citing Mt. Healthy, 429 U.S. at 287). Given that the substantial or motivating favor need not be the dominant or primary factor, Hill, 411 F.3d at 127 n.11 (citing Suppan, 203 F.3d at 235), in the third prong of the analysis, "the employer may defeat the employee's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct." Id. at 125 (citing Mt. Healthy, 429 U.S. at 287). Put another way, the defendant may defeat the plaintiff's claim by proving that the protected activity was not the "but for" cause of the discipline. Id. at 127 n.11 (citing Suppan, 203 F.3d at 235). Significantly, the second and third prongs in this analysis present factual questions, which are often best left to a jury. Id. at 127.

In this case, Defendants do not contest for purposes of their summary judgment motion that Plaintiff was engaging in protected activity. Instead, they argue that they are entitled to judgment

---

[11]In order to support a retaliation claim, the alleged retaliatory conduct must be "'sufficient to deter a person of ordinary firmness from exercising his First Amendment rights . . . .'" McKee v. Hart, 436 F.3d 165, 170 (3d Cir. 2006) (quoting Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000)). "The effect of the alleged conduct on the employee's freedom of speech 'need not be great in order to be actionable,' but it must be more than *de minimis*." Id. (quoting Suppan, 203 F.3d at 235); see also O'Connor v. City of Newark, 440 F.3d 125, 128 (3d Cir. 2006) ("A First Amendment retaliation claim will lie for any individual act which meets th[e] deterrence threshold, and that threshold is very low . . . .").

At oral argument, Defendants argued that the mere issuance of the April 19, 2007 Unsatisfactory Incident Conference Notice was not an adverse employment action and, therefore, could not be considered retaliation. Defendant have not, however, developed this argument in their briefs or cited relevant authority. Moreover, in light of the very low deterrence threshold, we will not enter judgment in Defendants' favor on that basis.

in their favor on the § 1983 claim because Plaintiff cannot meet his burden of proof under the second step of the three-step analysis that his protected activity was a motivating or substantial factor for any alleged retaliation.  They further argue that, in the third step of the analysis, the undisputed facts of record establish that they disciplined Plaintiff without regard to his protected speech and would have taken the same disciplinary action even if he had not engaged in the protected speech.

With respect to the second prong of the analysis, the United States Court of Appeals for the Third Circuit has held that a Plaintiff may demonstrate a "broad array of evidence" to infer a causal connection between protected activity and alleged retaliatory action.  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000).   It has suggested that timing alone can be "sufficient to establish [the] causal link" necessary to support a plaintiff's prima facie case, but that "the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive . . . ."  Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997)).[12]   When the timing alone is not unusually suggestive, temporal proximity in combination with other record facts can give rise to an inference that an employee's protected conduct was a substantial or motivating factor for an employer's alleged retaliation.  See, e.g., San Filippo v. Bongiovanni, 30 F.3d 424, 444 (3d Cir. 1994).  "[E]ach case must be considered

---

[12]Most of the cases discussing the relevance of temporal proximity to a determination of causation arise in the Title VII context.  See, e.g., Jalil v. Avdel Corp., 873 F.2d 701 (3d Cir. 1989) (involving retaliation claim under Title VII); Woodson v. Scott Paper Co., 109 F.3d 913, 919-20 (3d Cir. 1997) (involving retaliation claim under Title VII); Krouse, 126 F.3d 494 (involving retaliation case under the Americans with Disabilities Act, which is analyzed under the same framework employed for Title VII retaliation claims).  The Third Circuit has noted the relevance of this analysis in cases involving First Amendment retaliation as well.  See Ambrose v. Twp. of Robinson, Pa., 303 F.3d 488, 494 (3d Cir. 2002); Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

with a careful eye to the specific facts and circumstances encountered."[13]  Farrell, 206 F.3d at 279.

In the instant case, Defendants assert that there is no temporal proximity, much less other record evidence, from which a jury could conclude that Plaintiff's protected conduct was a substantial or motivating factor for the alleged retaliation.  However, in arguing as such, they have failed to meet their Rule 56 burden of identifying record submissions that demonstrate the absence of a genuine issue of material fact on this issue.  Indeed, rather than confining their arguments to undisputed record facts, they largely rest their arguments on both disputed facts and inferences in their own favor, which are improper at the summary judgment stage.  See, e.g., supra notes 2, 5, and 8.  In doing so, they obfuscate the summary judgment record.

When instead viewing the purely paper record before us in the light most favorable to Plaintiff, a jury could find that there is close temporal proximity between Plaintiff's protected activity, i.e., his voicing of concerns regarding the reporting of school violence between March 22,

---

[13]Compare Jalil, 873 F.2d at 708 (holding that temporal proximity alone established plaintiff's prima facie case of retaliatory discharge under Title VII when employer discharged plaintiff two days after receiving notice that plaintiff had filed an EEOC Complaint), with Andreoli v. Gates, 482 F.3d 641, 650 (3d Cir. 2007) (finding that five-month time period between employee's informal complaint and first alleged adverse action, without additional evidence, was insufficient to infer casual connection in Title VII retaliation case); and Weston v. Pennsylvania, 251 F.3d 420, 431-32 (3d Cir. 2001) (concluding that discipline "more than a year distant from . . . protected activities" was not "unusual enough to become a casual link"); and Krouse, 126 F.3d at 503 (stating that, "standing alone," period of nineteen months between filing of EEOC charge and alleged retaliatory conduct did not support a finding of causal link); and Wooler v. Citizens Bank, Civ. A. No. 06-1439, 2006 WL 3484375, *7 (E.D. Pa. Nov 30, 2006) (holding that gap of approximately four months between Plaintiff's protected activity and termination was not "unusually suggestive"), aff'd, 274 Fed. Appx. 177 (3d Cir. 2008).  See also San Filippo, 30 F.3d at 444 (refusing to decide in § 1983 retaliation case whether temporal proximity could, by itself, support an inference that the protected activity was a substantial factor in the alleged retaliatory action where other evidence also supported that inference); Farrell, 206 F.3d 271 (refusing to decide in Title VII case whether a 3-4 week gap between plaintiff's refusal of sexual advance and alleged retaliation was sufficient to support an inference of causation, where other record evidence also supported that inference).

-17-

2007 and April 18, 2007, and the issuance of the Unsatisfactory Incident Conference Notice on April 19, 2007, and that such temporal proximity is suggestive of a retaliatory motive.  Likewise, if the jury were to consider the existing record evidence, and to resolve all factual disputes and draw all inferences in Plaintiff's favor, it could conclude that Plaintiff had worked for the School District for seven years, had never completed his screenings in a timely fashion, and had been criticized for several other apparent performance deficiencies, but had never before been disciplined for any performance failures.[14]  It could also find that, in the 2005-2006 school year, Plaintiff had a number of performance-related issues, including his failure to complete the mandatory screenings, but nevertheless received a "Satisfactory" rating at the conclusion of the school year.  Defendants have marshaled no arguments from which we could conclude that these permissible factual findings and inferences could not support a jury finding that Plaintiff's protected conduct was a substantial or motivating factor in the alleged retaliation.  Accordingly, we find that there remain genuine issues of material fact as to the second prong of the § 1983 analysis.

Likewise, we find that there are  genuine issues of material fact as to whether Defendants would have taken the same allegedly retaliatory actions even in the absence of Plaintiff's protected conduct.  To prevail on this prong, a defendant "must show by a preponderance of the evidence that the same decision would have been made had the protected conduct not played a substantial [or motivating] role . . . ."  Suppan, 203 F.3d at 236.  Defendants argue that the undisputed record

---

[14]Defendants maintain that Burns's issuance of a conference memorandum during the 2005-2006 school year constituted prior discipline.  However, as detailed above, it is disputed whether Burns actually issued that conference memorandum.  See supra note 2.  Viewing the facts in the light most favorable to Plaintiff, we accept for purposes of Defendants' motion that Burns issued no such memorandum.  Moreover, even if she had issued it, it is undisputed that Defendants did not take any punitive action following the memorandum's alleged issuance.  Thus, the summary judgment record does not support a conclusion that Plaintiff was disciplined prior to April 2007.

evidence leaves no question that Plaintiff was disciplined because he was a long-term problem employee, who, in the first seven months of the 2006-2007 school year, completed just a small percentage of the required student medical screenings, and who continued that pattern in the 2007-2008 school year.  Plaintiff counters that the screening deficiencies were a mere pretext for his discipline.  Plaintiff again notes that he had never before been disciplined for similar deficiencies and that the temporal proximity between his protected speech and his discipline creates an inference of pretext.[15]  He also avers in his affidavit that it was "almost impossible to complete all mandated screenings at Tilden due to many factors, including but not limited to: . . . sick calls, treatment of students during the course of the day, performing administrative duties and billings."[16]  (Pl. Aff. ¶ 12.)

We agree with Defendants that the undisputed record evidence establishes that Plaintiff was a long-term problem employee, who did not complete his medical screenings in a timely manner. However, Defendants have nevertheless failed to proffer any argument based on a proper analysis of the summary judgment record from which we could conclude that no reasonable jury could find that Defendants would not have taken the adverse action against Plaintiff in the absence of his

---

[15]While temporal proximity is most commonly associated with the second prong of the retaliation analysis, it may also be considered in assessing the third prong.  Jalil, 873 F.2d at 709 n.6 (stating suggestive timing of plaintiff's discharge, in conjunction with other evidence that called into question employer's true motivations for discharging plaintiff, created a genuine issue of fact as to the employer's true motivation for firing plaintiff.)

[16]Ms. Erskine counters that Plaintiff "had less than the mandated caseload of students" for the 2006-2007 school year and, as such, "should have been able to accomplish the majority of basic responsibilities of the work of a school nurse during [that school year]."  (Ex. D-25; see also Erskine Dep. at 156:5-7 ("Other nurses with 500 or 600 children are able to do their screenings in a timely manner.").)  However, at best, this evidence creates an issue of fact as to whether it was impossible for Plaintiff to complete his screening in a timely manner.

protected conduct.  Indeed, as stated above, Defendants fails to acknowledge the fact that a jury could find the timing of the discipline to be suggestive of a retaliatory movie and could find that Plaintiff had not incurred prior discipline for similar past conduct.  Having failed to acknowledge these potential findings, it also fails to address the probative value of these findings in conjunction with other record facts, such as the strikingly sweeping reach, both chronologically and substantively, of Burns's April 19, 2007 Unsatisfactory Incident Conference Notice, and Plaintiff's arguably valid excuses for his screening deficiencies.  In the end, we find that Defendants, as the moving parties, have not demonstrated the absence of genuine issues of material fact with respect to retaliatory motive.  Accordingly, we deny Defendants' Motion for Summary Judgment on Plaintiff's § 1983 retaliation claim.

B. <u>Pennsylvania Whistleblower Act</u>

Defendants also maintain that they are entitled to summary judgment in their favor on Plaintiff's claim of retaliatory termination under the Pennsylvania Whistleblower Act.  Section 1423(a) of the Whistleblower Act provides as follows:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee . . . makes a good faith report . . . to the employer or appropriate authority [of] an instance of wrongdoing or waste.

43 Pa. Cons. Stat. § 1423(a).  In order to prove a prima facie case of retaliatory termination under the Whistleblower Act, a plaintiff must (1) show by a preponderance of the evidence that he made a good faith report of wrongdoing prior to the alleged retaliation, <u>O'Rourke v. Commonwealth</u>, 778 A.2d 1194, 1200 (Pa. 2001) (citing  43 Pa. Cons. Stat. § 1424(b)), and (2) "'show by concrete facts

-20-

or surrounding circumstances'" that the whistleblowing "'led to'" his discipline, <u>Golaschevsky v. Dep't of Envtl. Prot.</u>, 720 A.2d 757, 759 (Pa. 1998) (quoting <u>Gray v. Hafer</u>, 651 A.2d 221, 225 (Pa. Commw. Ct. 1995)).   To meet this causation burden, it is not sufficient to rely on vague or inconclusive circumstantial evidence.  <u>Id.</u>  If a plaintiff satisfies the above burdens, the burden shifts to the defendant to "prove[] by a preponderance of the evidence that the action by the employer occurred for separate and legitimate reasons, which are not merely pretextual."  43 Pa. Cons. Stat. § 1424(c).  This means that, just as in a § 1983 retaliation case, "the employer must prove that it would have taken the same adverse employment action absent the employee's [protected conduct]." <u>O'Rourke</u>, 778 A.2d at 1204 (citing, <u>e.g.</u>, <u>Mount Healthy</u>, 429 U.S. at 285-86.)

As explained at length above, Defendants have not demonstrated the absence of genuine issues of material fact on the questions of whether Plaintiff's protected conduct led to his discipline and whether Defendants would not have taken the same adverse employment action against him in the absence of his protected conduct.  Accordingly, for essentially the same reasons that we deny Defendants summary judgment on Plaintiff's § 1983 retaliation claim, we also deny summary judgment on his Whistleblower Act claim.

IV.   CONCLUSION

For the foregoing reasons, we deny Defendants' Motion for Summary Judgment in its entirety.  An appropriate Order will be issued along with this Memorandum Opinion.

BY THE COURT:


 /s/ John R. Padova, J.
John R. Padova, J.